UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RICHARD TALMADGE,       : | |
|     Plaintiff,       : | |
|                : | |
| v.       : | 3:11-cv-01239-WWE |
|                : | |
| STAMFORD HOSPITAL,       : | |
|     Defendant.       : | |

**MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard Talmadge filed this action against defendant Stamford Hospital alleging violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Specifically, plaintiff alleges that defendant denied him employment as a nurse because of his past drug addiction.

Defendant has filed a motion for summary judgment on plaintiff's ADA claim. For the following reasons, defendant's motion will be granted.

**BACKGROUND**

The parties have submitted statements of fact, depositions, documents, and affidavits that establish the following factual background.

In 2010, plaintiff was caught stealing narcotics while working as a nurse in Bridgeport Hospital's main operating room. Plaintiff testified that a Drug Enforcement Agency ("DEA") representative told him that if he enrolled in a rehabilitation program through the Health Assistance interVention Education Network ("HAVEN"), a confidential assistance program for healthcare professionals dealing with substance abuse problems, his nursing license would not be affected. Plaintiff testified that if he did not go through the HAVEN program, there would be a consent order on his license indicating that he was caught stealing drugs.

Plaintiff took a sixteen-week leave of absence to participate in HAVEN's program. HAVEN advised that health professionals in its program should stay away from an operating room setting and have no access to narcotics for a period of one full year. Bridgeport Hospital filled plaintiff's position once it knew that plaintiff would not be returning after his sixteen week leave expired.

By enrolling in the HAVEN program, plaintiff was able to avoid suspension of his license or discipline from state or federal agencies.

Plaintiff sought treatment at Griffin Hospital, where his doctor wrote that he "seems to minimize his use, is anxious, worried about children and finances . . . has a nonchalant attitude regarding the reason for this treatment. 'I'll do whatever they want me to do.'" Records from Griffin Hospital also indicate, "Rich called . . . Haven wants him inpatient and he doesn't want to go."

On February 15, 2010, plaintiff was admitted to Marworth, an inpatient drug treatment center. Marworth's discharge summary notes list his chief complaint as, "I was asked to come here by HAVEN." HAVEN had referred plaintiff to Marworth for a medical evaluation, and after the evaluation, Marworth recommended that plaintiff participate in residential treatment. Marworth noted that "[h]e is probably going to need inpatient treatment because of the potential for legal and regulatory action against him."

Plaintiff informed his personal therapist, Dr. Gale Levin, that he "was reprimanded and told to go to [a] rehab center," and that he went to rehab under instruction or request from the DEA.

Plaintiff's therapist at Griffin Hospital observed that he was eager to return to work and

wrote, "He is determined to remain clean, return to work as soon as possible."

Upon discharge from Marworth, plaintiff's diagnosis was "opioid abuse." Plaintiff told Dr. Levin that he was "never addicted" and said he used the narcotic "just for fun, not to get high." Plaintiff testified that he began using narcotics in 2009 solely for personal, recreational use. Moreover, he specifically testified that he was never addicted to the Fentanyl he was using.

Plaintiff signed a contract with HAVEN on April 23, 2010. As part of the contract, plaintiff agreed:

> I shall not administer, count or have access to narcotics or other controlled substances or have responsibility for such activities in the course of my nursing duties until approved by my therapists and my professional director . . . Access to narcotics or other controlled substances will be reviewed annually.

On May 12, 2010, HAVEN allowed plaintiff to return to the practice of nursing, but prohibited him from accepting employment as a nurse in an operating room, procedure room, or recovery room setting until approved by HAVEN. HAVEN also prohibited plaintiff from administering, counting, or accessing narcotics or other controlled substances. HAVEN submitted letters to the Equal Employment Opportunity Commission ("EEOC") that stated that plaintiff could return to nursing on either December 6, 2010, or November 13, 2010.

On September 29, 2010, Evena Williams, defendant's Human Resource Partner contacted plaintiff by phone and scheduled an in person interview. Plaintiff submitted his handwritten application to Stamford Hospital on or about October 1, 2010. Plaintiff wrote on his application that Bridgeport Hospital was his present employer and his reason for leaving was "looking for greener pasture." Ms. Williams interviewed plaintiff in person on October 1, 2010. During this interview, plaintiff informed Ms. Williams that he went on a leave of absence from Bridgeport

Hospital, and when he was ready to return, the position had already been filled.  Plaintiff did not inform Ms. Williams that he was restricted from working as an operating room nurse at the time.  Ms. Williams did not make plaintiff a job offer during this interview.

Bob Bolek, Clinical Operations Director for Preoperative Services, also interviewed plaintiff on October 1, 2010.  Plaintiff informed Mr. Bolek that he was still technically employed by Bridgeport Hospital, but he was on a leave of absence, and Bridgeport Hospital did not hold his job for him while he was out on leave.  Plaintiff also informed Mr. Bolek that he was looking for another position because his co-workers blamed him for things that went wrong.

In his complaint, plaintiff alleged that he interviewed with both Evena Williams and Bob Bolek on October 1, 2010.  Plaintiff further alleged that he told Mr. Bolek about his history of drug use at this interview, and prior to his October 5, 2010 interview.  Plaintiff submitted an affidavit to the EEOC which stated that he disclosed his history of substance abuse to Mr. Bolek prior to his October 5, 2010 interview.  However, at plaintiff's deposition, he testified that he informed Mr. Bolek of his substance abuse *after* his shadowing interview on October 5, 2010.

After Mr. Bolek completed his interview with plaintiff on October 1, 2010, Mr. Bolek discussed the interview with Ms. Williams and informed her that plaintiff told him that he had been in rehab.  Mr. Bolek then asked Ms. Williams to set up a second interview so that plaintiff could "shadow" another nurse in the operating room.

After the initial interview on October 1, 2010, Ms. Williams verified that plaintiff had an active nursing license in the state of Connecticut.  This verification indicated that plaintiff had no pending charges or licensure actions against him.  Plaintiff returned to Stamford Hospital to shadow on October 5, 2010, where he shadowed another nurse in the operating room for half a

4

day.  During his interviews on October 1 and October 5, 2010, plaintiff did not inform Ms. Williams or Mr. Bolek that he was restricted from accessing narcotics or working in the operating room.  Plaintiff testified that he did not disclose his substance abuse issues to Mr. Bolek until the end of his day of shadowing in the operating room on October 5.  He explained to Mr. Bolek that he was "under the auspices of HAVEN" and that he went for weekly urine screens.  Plaintiff therefore never informed Ms. Williams or Mr. Bolek that he was prohibited from having access to narcotics or working in an operating room prior to his shadow interview on October 5, 2010.

      Plaintiff testified that by mid-October, Stamford Hospital had not made him a job offer. He testified that if he had been offered a job at his first interview, his start date would not have been until the first week of November, the date of the next orientation.  He testified that if he had been offered the job on November 1, 2010, he could have taken the job because "by November I was cleared free."

      Plaintiff testified that he received a call from HAVEN on October 16, 2010, informing him that the medical review board had approved lifting his restriction with some remaining conditions.

      After plaintiff completed his shadow interview, Ms. Williams spoke to Sal Mencken, Director of Human Resources, about perceived inconsistencies relating to plaintiff's application. She informed Mr. Mancino that plaintiff had written on his application that he was leaving Bridgeport Hospital for "greener pastures," then he informed them that he had actually gone on a leave of absence and Bridgeport Hospital filled his position.

      Defendant subsequently learned that plaintiff had gone to a rehabilitation program, but

when its human resources employees checked his license, there was no disciplinary action disclosed.  Ms. Williams was accustomed to seeing some type of restriction on a nurse's license when a nurse goes into rehab.  In addition, Mr. Mancino and Ms. Williams found it odd that Bridgeport Hospital did not hold plaintiff's position for him even though his Family Medical Leave Act ("FMLA.") leave ran out since they believed that operating room ("OR") nurses were extremely hard to find.

After reviewing plaintiff's application and license verification, Mr. Mancino advised Ms. Williams to ask plaintiff exactly what had happened at Bridgeport Hospital: whether he was caught stealing drugs or voluntarily came forward, whether the DEA or Department of Public Health ("DPH") was involved, and what his current status was.  In mid-October, Ms. Williams spoke with plaintiff on the phone, explained that she understood that he had given Mr. Bolek more information on why he left Bridgeport Hospital, and asked if he would tell her what happened.  Plaintiff explained that he was caught diverting drugs from Bridgeport Hospital.  He also disclosed that his manager caught him stealing, and he did not voluntarily come forward. Plaintiff stated that he went to rehab through HAVEN, Marworth, and Griffin Hospital, and that he had to do urine tests on a regular basis.  Ms. Williams then reported back to Mr. Mancino about her conversation with plaintiff.  Ms. Williams told Mr. Mancino that plaintiff said he was on a leave of absence because of what happened at Bridgeport Hospital.

Concerned about why Bridgeport Hospital would not report plaintiff's theft of narcotics to the DEA or DPH, Mr. Mancino contacted Stamford Hospital's Director of Pharmacy, Geoff Gittleson, to inquire whether it made sense that Bridgeport Hospital would confront a nurse about stealing narcotics without the DPH present.  Mr. Mancino and Ms. Williams also contacted

the Executive Director of Nursing, Patrice Kelly, to see if she had any experience with this type of situation.  Mr. Mancino could not understand why but Bridgeport would not rehire plaintiff, since OR nurses are so hard to find.

> Mr. Mancino believed plaintiff was lying about several issues, and testified:
>
>> A: I think specifically he lied about his -- … the reason why [he] wanted to leave Bridgeport. I think he lied about what happened at Bridgeport. And I think those lies also gave me concern that someone with his level of experience as an operating room nurse … that Bridgeport wouldn't wait for him, wouldn't keep him. Not that it would be their loss, but I just thought that, wow, if he's as good as they say – I already know he's lying to me, something is not right here. The fact that Bridgeport won't wait for him and then rehire him troubled me… if you have a good OR nurse, you wait for them. I was surprised that they were very quick to say, well, his leave is up and they don't have a position.

Mr. Mancino decided not to hire plaintiff in November 2010.  In late November 2010, Ms. Williams informed plaintiff that Stamford Hospital had decided to explore other candidates.

In December or January, plaintiff called Ms. Williams again to ask her to reconsider his application.  Ms. Williams ended the call quickly because she was expecting another call.  Plaintiff called Mr. Mancino to complain about Ms. Williams' alleged comment to the effect of, "You know, Richard, I'm sorry, but your experience, your history of drug abuse, you're too early, too fresh."  Mr. Mancino said he would look into the matter.  Mr. Mancino asked Ms. Williams about plaintiff's allegation that she said he was "too fresh."  Ms. Williams explained that she had told plaintiff that it was too soon from the fact that they had just rejected him.

Plaintiff called Mr. Mancino a second time on February 17, 2011.  Plaintiff testified that during this conversation, "Mr. Mancino was in a way insinuating that I was not being truthful with my application."  Plaintiff also testified, "Mr. Mancino himself told me I was not truthful

7

with my application." Mr. Mancino told plaintiff, "I'm struggling with the fact that you're not telling me the truth… it just doesn't make sense; it doesn't add up to me everything that happened at Bridgeport Hospital with you and what you're telling us." Mr. Mancino explained to plaintiff that wrote that he was leaving Bridgeport for "greener pastures," then disclosed that he was on a leave of absence. Mr. Mancino asked why Bridgeport Hospital would not hire him back, given his skills as an operating room nurse. Mr. Mancino said that he could not understand why a registered nurse with more than ten years of experience in the OR would not be highly sought after by Bridgeport Hospital. As they spoke on the phone, Mr. Mancino went online and found several positions in the Yale New Haven Health System for which plaintiff was qualified.

On February 18, 2011, Mr. Mancino sent plaintiff a letter stating, "as we informed you in November and in my prior conversation with you in January, we will not be continuing the application process nor will we be extending you a job offer for this position."

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24.  The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him.  See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party.  See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004).  If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**ADA Discrimination**

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, [] (1973)." McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).  To establish a prima facie case of discrimination under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) the employer is subject to the ADA; (2) plaintiff was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (4) he suffered

an adverse employment action because of his disability.  Id.  If plaintiff meets this initial burden, defendant must proffer a legitimate, nondiscriminatory reason for its decision.  Fall v. New York State United Teachers, 289 Fed. Appx. 419, 421 (2d Cir. 2008).  After a legitimate reason has been proffered, the burden returns to plaintiff to furnish evidence that the reason offered by the employer is pretext.  Stephan v. W. Irondequoit Cent. Sch. Dist., 450 Fed. Appx. 77, 79 (2d Cir. 2011).

**Recreational Drug Use vs. Drug Addiction**

Defendant argues that plaintiff was not disabled within the meaning of the ADA when he applied for defendant's OR nurse position because plaintiff was merely a recreational drug user.  Under the ADA, a disability means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  Id. at 79 (quoting U.S.C. § 12102(2)).  "[I]t is important to emphasize that past drug addiction, not merely past use, is required to make out a claim under the ADA. . . . In order to prevail at trial, [plaintiff] therefore must demonstrate that he was actually addicted to drugs or alcohol in the past, and that this addiction substantially limited one or more of his major life activities."  Buckley v. Consolidated Edison Co. Of New York, Inc., 127 F.3d 270, 274 (2d Cir. 1997) (vacated on other grounds by Buckley v. Consolidated Edison Co. Of New York, Inc., 155 F.3d 150 (2d Cir. 1998).

Plaintiff contends that his medical records establish a material issue of fact as to whether he was addicted to Fentanyl.  Indeed, plaintiff treated with various medical professionals, including an intensive outpatient program at Griffin Hospital, a 28 day inpatient rehabilitation at Marworth, and therapy with Drs. Gale Levin and Michael Reitman.  Moreover, Marworth's

discharge summary stated, "[T]here is some concern that his use is very much similar to that of an individual who has opioid dependence." This evidence raises an issue of material fact as to whether plaintiff was a recovering drug addict.

The Court is skeptical of whether plaintiff has adequately demonstrated that his addiction substantially limited one or more of his major life activities. See Burch v. Coca-Cola Co., 119 F.3d 305, 316-17 (5th Cir.1997) (holding that recovering alcoholic had not established that he had a disability under the ADA where he produced no evidence that his addiction had interfered with major life activities or that "the effects of his alcoholism-induced inebriation were qualitatively different than those achieved by an overindulging social drinker"). Nevertheless, resolving all ambiguities and drawing all permissible factual inferences in favor of plaintiff, a reasonable jury could find that plaintiff's opiate dependance did substantially limit one or more major life activities. This issue becomes moot as plaintiff has failed to demonstrate that he was a qualified individual under the ADA, as discussed below.

**Qualified Individual under the ADA**

Defendant next argues that plaintiff was not qualified for the OR nurse position because he was prohibited from working in an operating room or accessing narcotics until mid-November.

As noted above, to establish a prima facie case of discrimination under the ADA, a plaintiff must show that he was "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation." Logan v. SecTek, Inc., 632 F. Supp. 2d 179, 183 (D. Conn. 2009). The term "qualified" means that "the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such

individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m); see also Cousins v. Howell Corp., 113 F. Supp. 2d 262, 270 (D. Conn. 2000).

Defendant argues that plaintiff was not qualified based on an August 27, 2012 letter from HAVEN, which stated:

> On October 13, 2010, it was determined that [plaintiff] would be allowed access to narcotics within the scope of nursing duties after an additional month of negative random drug testing and that he would be allowed to return to the operating room environment after he submitted to an evaluation for an opiate blocker. He met both requirements on or about November 10, 2010.

Based on this information, defendant argues that plaintiff could not fulfill the basic job requirement for the OR nurse position, and he was not a qualified individual when he initially interviewed on October 1 and 5, 2010. In addition, plaintiff testified that the orientation was scheduled for the first week of November, which he believed would have been his start date if he had been offered the position. Plaintiff was not a qualified individual at that time either because his job restrictions were still in place during the first week in November.

Plaintiff contests that the August 27, 2012 HAVEN letter is an inadmissible hearsay document. Accordingly, plaintiff argues that there is no admissible evidence from which the Court could conclude that he could *not* have accepted the job from defendant on November 5, 2010. Plaintiff asserts that the only admissible evidence before the Court on this topic is his own affidavit and deposition testimony. Plaintiff argues that this evidence establishes that he was, in fact, cleared to return to work in an OR setting and to access narcotics at the beginning of November, prior to the proposed start date of November 5, 2010.

At deposition, plaintiff testified that he was cleared to return to an OR position around May 2010.[1]  Pl.'s Dep. 36:13-19.  He testified that his key restriction was lifted in mid or late October.  Id at 55:21-23; 64:15-23.  Under questioning from his own attorney, plaintiff stated:

> On or about October 16, I just recall that after my – after I attended the open house in the – at Yale-New Haven she – I got a phone call from [HAVEN] stating that the board – the medical review board approved the lifting of my restriction with some conditions.

Id at 187:25-188:4.

The August 27, 2012 HAVEN letter is admissible.  Federal Rule of Evidence 801(d)(2)(C) provides:

> (d) Statements That Are Not Hearsay.  A statement that meets the following conditions is not hearsay:
>
> (2) An Opposing Party's Statement. The statement is offered against an opposing party and:
>
> (C) was made by a person whom the party authorized to make a statement on the subject;

Here, plaintiff authorized HAVEN to release information from his records.  Specifically, plaintiff authorized HAVEN to release "information concerning when [plaintiff] was cleared to return to work as a nurse and access and dispense narcotics."  HAVEN responded by stating:

> On October 13, 2010, it was determined that [plaintiff] would be allowed access to narcotics within the scope of nursing duties after an additional month of negative random drug testing and that he would be allowed to return to the operating room environment after he submitted to an evaluation for an opiate blocker.  He met both requirements on or about November 10, 2010.

This statement has been offered against plaintiff and made by a person whom plaintiff

---

[1]Plaintiff has since backed away from this assertion.

authorized to make a statement on the subject of when he was cleared to return to work. As such, it is not hearsay. Even if the statement were considered hearsay, the Court would nevertheless consider it under the residual exception of Federal Rule of Evidence 807. Moreover, plaintiff bears the burden of establishing his prima facie case, and plaintiff's self-serving affidavit and deposition testimony that contradict HAVEN's time-line consist themselves only of hearsay statements. For example, under questioning from his own attorney, plaintiff stated:

> On or about October 16, I just recall that after my – after I attended the open house in the – at Yale-New Haven she – I got a phone call from [HAVEN] stating that the board – the medical review board approved the lifting of my restriction with some conditions.

Based on HAVEN's letter, plaintiff was not cleared to access narcotics or return to an operating room environment until after the employment-start-date of November 5, 2010. Two additional letters from HAVEN to the Equal Employment Opportunity Commission, both dated March 14, 2011, corroborate that plaintiff was not approved to return to the practice of OR nursing before the first week in November. Accordingly, he was not qualified to perform the essential functions of the job. Moreover, no reasonable accommodation could have been made for an OR nurse that could not work in an operating room.

**Reconsideration of Plaintiff's Application**

Plaintiff argues that even if he was not cleared to work in an OR setting with access to narcotics until mid-November, his subsequent contacts with defendant should be considered new applications. However, plaintiff's own testimony undermines this theory:

> When after my phone conversation with Miss Williams stating that they considered other applicants, I don't know how long – how many days or

> weeks or months passed. But I do believe sometime during, I think, [the] month of December, I believe, I looked into Stamford Hospital's web site and there were still openings for the OR. And I believe I sent her an e-mail stating that I notice – I – Don't quote me verbatim, but in a way I kind of told – written a letter or e-mail that there are still openings in the operating room and I wonder if she would *reconsider* my application.
>
> Well, the general idea in my e-mail is that's what it is. I told – I went to the web site, I saw there was still an opening, available position in the Stamford Hospital and I did ask her if she would *reconsider* my application.

Pl.'s Dep. 145:6-13; 146:21-25.

> I then sent an e-mail to Ms. Williams asking her to *reconsider* my application for one of these positions.

Pl.'s Aff. ¶ 40.

There is no evidence that plaintiff's communications with defendant concerning reconsideration of his initial application constituted new applications. Accordingly, defendant's motion for summary judgment will be granted.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment [Doc. #40] is GRANTED. The Clerk is instructed to close this case.

Dated this 29th day of May, 2013, at Bridgeport, Connecticut.

                        /s/
            WARREN W. EGINTON
            SENIOR UNITED STATES DISTRICT JUDGE

15